349 F.2d 20
 UNITED STATES of America, Plaintiff-Appellee,
v.
James R. HOFFA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas Ewing PARKS, Defendant-Appellant. UNITED STATES of America, Plaintiff-Appellee,
v.
Larry CAMPBELL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ewing KING, Defendant-Appellant.
 Nos. 15876-15879.
 United States Court of Appeals Sixth Circuit.
 July 29, 1965.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Morris A. Shenker, St. Louis, Mo., for James R. Hoffa.
 Cecil D. Branstetter, Nashville, Tenn., for Larry Campbell.
 Jacques M. Schiffer, New York City, for Thomas Ewing Parks.
 Harold E. Brown, Chattanooga, Tenn., for Ewing King.
 James E. Haggerty, Detroit, Mich., for James R. Hoffa, Jacques M. Schiffer, New York City, for Thomas Ewing Parks, Cecil D. Branstetter, Nashville, Tenn., for Larry Campbell, Harold E. Brown, Chattanooga, Tenn., for Ewing King, on joint brief, for appellants.
 Howard P. Willens and Nathan Lewin, Attys., Dept. of Justice, Washington, D. C., for appellee, Herbert J. Miller, Jr., Asst. Atty. Gen., Philip R. Monahan, Ronald L. Gainer, Stuart R. Pollak, Attys., Dept. of Justice, Washington, D. C., on the brief, John J. Hooker, James F. Neal, Nashville, Tenn., John H. Reddy, U. S. Atty., Chattanooga, Tenn., of counsel.
 Osmond F. Fraenkel, New York City, on brief for amicus curiae, the American Civil Liberties Union, Melvin L. Wulf, New York City, of counsel.
 Before WEICK, Chief Judge, and MILLER and CECIL, Circuit Judges.
 WEICK, Chief Judge.
 
 
 1
 Appellants were found guilty by a jury in the District Court on charges of wilfully endeavoring to influence, intimidate and impede petit jurors in the discharge of their duties, in violation of 18 U.S.C. § 1503.[1] The petit jurors had been summoned for jury service in the trial of United States of America v. James R. Hoffa and Commercial Carriers, Inc. (Criminal Case No. 13,241) in the United States District Court for the Middle District of Tennessee, Nashville Division. The latter case has been referred to as the Test-Fleet case, and involved a two count information charging violation of the Taft-Hartley Act (29 U.S.C. § 186). It was tried before District Judge William E. Miller of Nashville.
 
 
 2
 The unlawful endeavors which the Government's evidence tended to prove consisted of contacts through intermediaries with acquaintances, friends or relatives of two of the petit jurors and one venireman in an effort to influence their votes by bribery. Venireman James C. Tippens reported to the trial judge on the second day of the trial that his neighbor, Lawrence Medlin, had offered him $10,000. in $100. bills to influence his vote. Judge Miller excused Tippens from the jury.
 
 
 3
 The Government's evidence tended to prove that endeavors were made to bribe the son of juror Gratin Fields for the purpose of influencing his father; that contact was made with the juror's daughter for the same purpose; that contacts were made with Tennesee State Patrolman James Paschal, husband of juror, Mrs. James Paschal; that promises were made to Patrolman Paschal to obtain a promotion for him if he would influence his wife's vote as a juror. When these efforts were reported to District Judge Miller he excused jurors Fields and Paschal and filled their places with alternate jurors.
 
 
 4
 The trial of the Test-Fleet case lasted for about two months. It resulted in a "hung jury." Judge Miller then ordered that a grand jury be convened to investigate the attempts to influence the petit jurors, which resulted in the five count indictment in the present case. After entering the order, Judge Miller recused himself from further consideration of the case. District Judge Frank Gray, Jr., of Nashville, heard a number of preliminary matters, after which he recused himself and the case was assigned for trial to District Judge Frank Wilson. Judge Wilson transferred the case for trial from Nashville to Chattanooga. It lasted six and one-half weeks.
 
 
 5
 The record and exhibits in this case are voluminous.
 
 
 6
 Almost every question which the ingenuity of counsel could think of, was raised in the trial court.
 
 
 7
 In this Court Appellants have presented sixteen questions, subdivided into thirty-six parts. Counsel for both parties were granted leave to file briefs much longer than authorized by our rules. Each side was allowed two hours for oral arguments.
 
 
 8
 Was the Grand Jury Improperly and Illegally Impaneled?
 
 
 9
 A motion to dismiss the indictment was filed by Appellant Hoffa and later joined in by the other Appellants in the District Court, in which it was claimed that the grand jury did not represent a fair cross-section of the community; that the Jury Commissioner and the Clerk had delegated to other persons their duty to select the names for the jury box; and that the names in the jury box from which the grand jury was selected had been suggested substantially by United States officials, United States Postmasters, state officials, bankers and employers, resulting in a substantial discrimination against the defendants. Certain exhibits were attached to the motion, sociological values and attitudes of the purporting to show the names, addresses and description of the economic and suggesters.
 
 
 10
 On the day set for the hearing, Hoffa filed an Offer of Proof stating, among other things, that officers and officials of federally supervised banks and Postmasters serving the Middle District of Tennessee are, as a class, biased and prejudiced against Negroes, Jews, Catholics and manual or blue collar workers, and would not knowingly submit their names for jury service; that bankers, as a class, are also biased and prejudiced against persons not prompt in the payment of their bills, against persons taking any active part in the political or civic life of their communities, and against persons having reputations as liberals or progessives.
 
 
 11
 Neither the motion nor the offer of proof were verified. Neither stated in what manner nor by what means these charges would be proved.
 
 
 12
 Affidavits were filed by the Clerk of the District Court and the Jury Commissioner. It appeared therefrom that the "Suggester System," also referred to as "Key Men System," was used to procure names for the grand jury. The Clerk sent a letter[2] to various persons residing in the counties composing the Middle District of Tennessee. The Clerk's affidavit stated how the suggesters were chosen.[3]
 
 
 13
 The Jury Commissioner's affidavit stated that he had written for names of qualified jurors to the Jury Commissioners for the Columbia and Cookeville Divisions of the Middle District of Tennessee. In addition he wrote a letter, identical in form to the letters sent by the Clerk, to a citizen residing in each of the twelve counties of the Nashville Division, excluding Wilson and Davidson Counties, requesting the names of persons from all walks of life, to serve as jurors. Males and females were included in the list. Many of the suggesters were known to him personally, and many others were known to him by reputation. Upon receiving the lists he reviewed them and compiled the list of names to be placed in the jury box. He added fifteen or twenty names of persons residing in Wilson County, who he knew were qualified. He met with the Clerk. Each alternated in placing one name at a time in the jury box until there were four hundred names in the box. They drew one hundred names from the box, from which they selected twenty-three persons, who made up the grand jury.
 
 
 14
 Prior to the hearing District Judge Frank Gray, Jr. entered an order establishing the sequence of issues to be heard on the motion:
 
 
 15
 "1. Whether a suggester system for the selection of prospective grand jurors is invalid, per se, so as to invalidate actions of a grand jury so selected.
 
 
 16
 "2. Whether a sufficient showing has been made to authorize an inquiry whether the manner in which the suggester system was used in selecting the present grand jury was such as to invalidate the indictment.
 
 
 17
 "3. Whether the court failed to take proper precautions against seating grand jurors who may have been influenced by publicity, and, if so, whether the indictment is thereby invalidated.
 
 
 18
 "4. Whether a sufficient showing has been made to authorize an inquiry as to whether the grand jury was biased and prejudiced by publicity."
 
 
 19
 The defense subpoenaed the Clerk, the Jury Commissioner and seventy-seven of the ninety-two suggesters listed in their exhibit. At the hearing the Court heard oral arguments from counsel for each defendant and for the Government. The Court called attention to his previous order and sought time after time to elicit from defense counsel proffers of proof as to the names of witnesses and what their testimony would be in support of the charges contained in the motion. In this effort the Court was unsuccessful. The most that could be secured was the statement of counsel that the proof would come from the testimony of the Clerk, the Jury Commissioner, and the seventy-seven suggesters. Defense counsel had talked to only one suggester at that time. The Court would not permit their interrogation because the defense had not established the necessary foundation therefor.[4]
 
 
 20
 The Court did permit proof to be offered on the charge that the Clerk had placed in the jury box the name of a man of Jewish faith, knowing that he was represented by defense counsel Osborn and would likely be challenged for cause. The evidence disclosed that this charge was wholly without merit. The Clerk did not know that the prospective juror was represented by Mr. Osborn.
 
 
 21
 The Suggester or Key Men System has been in extensive use in many of the Circuits. The use of the system was approved by the Supreme Court in Scales v. United States, 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) affirming 260 F.2d 21, 44-46 (C.A.4, 1958), and by other Courts. Padgett v. Buxton-Smith Mercantile Co., 283 F.2d 597 (C.A. 10, 1960) cert. denied 365 U.S. 828, 81 S. Ct. 713, 5 L.Ed.2d 705 (1961); Windom v. United States, 260 F.2d 384 (C.A.10, 1958); Walker v. United States, 93 F.2d 383 (C.A.8, 1937) cert. denied 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103 (1938); United States v. Hoffa, 205 F.Supp. 710 (S.D.Fla., 1962); United States v. McClure, 4 F.Supp. 668 (E.D.Pa., 1933).
 
 
 22
 The use of suggesters does not constitute a delegation of authority. Walker v. United States, supra.
 
 
 23
 While the purpose of using suggesters was to obtain an impartial jury drawn from the names of persons representing a cross-section of the community, we know of no requirement that the suggesters themselves be selected on such a basis. Nor is it necessary that every jury contain representatives of all the various classes and groups in the community. But prospective jurors shall be selected without systematic and intentional exclusion of any of the groups. The means whereby this may be accomplished rests within the sound discretion of the courts and their officers guided by statutory provisions. Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).
 
 
 24
 Although we think it would have been good practice to send questionnaires to the prospective grand jurors inquiring as to their qualifications, the failure to do so in our judgment did not invalidate the panel. The Clerk and Jury Commissioner remained in control. They reviewed the lists submitted by the suggesters and placed additional names in the box. There was no proof offered that any of the grand jurors chosen did not possess the statutory qualifications.
 
 
 25
 In the Report of the Judicial Conference Committee on the operation of the Jury System, it is stated:
 
 
 26
 "The key-man system is the most widely used and if the key-men are selected with discretion and a view of securing diversification, it is productive of generally good results. Periodic letters to the key-men keep the lists coming in so that there is a constant supply of new names being added. A sample of such a letter asking for a list is attached to Exhibit 3. The jury commissioners may or may not use the same methods as the clerks." 26 F.R.D. 409, 470.
 
 
 27
 The courts will not permit a full scale investigation to be made of its jury panel until it is suspect. If this were not so the trial of a criminal case could be diverted by unsupported charges. Court officials, jurors, suggesters and other persons could be subjected to lengthy and needless inquisitions which in the future might deter them from rendering effective service to the courts.
 
 
 28
 In Windom v. United States, supra, Judge Murrah said at page 385:
 
 
 29
 "But the burden of making a showing that some class was improperly excluded from the jury lies with the defense. Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187. We will not presume that the key persons did not follow instructions to recommend persons who are fairly representative of the whole population of their communities. Surely, some showing of a disposition to discriminate is prerequisite to a searching investigation. The court should not be required to permit a full scale investigation of its jury panel until it is suspect."
 
 
 30
 To the same effect are Padgett v. Buxton-Smith Mercantile Co., supra; cf. Poliafico v. United States, 237 F.2d 97, 110 (C.A. 6, 1956) cert. denied 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597; United States v. Romano, 191 F.Supp. 772, 775-776 (D., Conn.1961).
 
 
 31
 Distinct evidence in support of the motion must be offered. Glasser v. United States, 315 U.S. 60, 87, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The evidence must be more than mere statements of counsel of what they hope they will be able to prove. Frazier v. United States, 335 U.S. 497, 503, 69 S.Ct. 201 (1948).
 
 
 32
 Appellants argue that the suggester system produced exclusions; that the names of only four Negroes and two Catholics were placed in the jury box when there should have been twenty-five Negroes and Catholics to give them proportionate representation according to Census figures; that there were not enough blue collar wage earners; and that the names of only thirteen women were drawn, which were insufficient.
 
 
 33
 The Court found that the list of prospective grand jurors actually contained the names of all the classes claimed to have been excluded. This certainly does not prove systematic exclusion of cognizable elements in the community. It is not required that there be a proportionate representation in the grand jury panel of all classes and religions. It is doubtful whether any system could be devised to accomplish this purpose. Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Hernandez v. State of Texas, 347 U.S. 475, 482, 74 S.Ct. 667, 98 L.Ed. 866 (1954); Cassell v. State of Texas, 339 U.S. 282, 286-287, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Fay v. People of State of New York, 332 U.S. 261, 284-285, 291, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Akins v. State of Texas, 325 U.S. 398, 403-404, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Padgett v. Buxton-Smith Mercantile Co., supra; United States v. Fujimoto, 102 F.Supp. 890, 894-895 (D.Haw. 1952).
 
 
 34
 It should be pointed out that Appellants' analysis pertained only to the one hundred names drawn, and not to the other three hundred names placed in the jury box; that the data contained in the analysis resulted from neighborhood inquiry; that there were eight panel members whose races were not disclosed; and that there were three panel members whose religious preferences were not ascertained. Without going into other discrepancies, we are of the opinion that the analysis falls far short of making the requisite showing to require a full scale investigation.
 
 
 35
 Nearly five months later (December 16, 1963) a delayed motion for rehearing was filed by Appellant Campbell, substantially joined in by Hoffa, to which were attached affidavits of three investigators, Polk, McMackin and Ziegler, who had interviewed a number of suggesters in September, 1963. It has not been explained why the filing of the motion for rehearing was delayed. These affidavits, together with the Government's cross-examination of the investigators in related cases involving the same grand jury, were received in evidence by stipulation.
 
 
 36
 In the light of the cross-examination, the affidavits of the investigators appear to be misleading. The four suggesters interviewed by Polk told him that in every case they followed the instructions contained in the letter from the Clerk or Jury Commissioner. While Polk stated in his affidavit that these suggesters gave some evidence as to bias against Negroes, they all told him that prejudice played no part in the performance of their duties as suggesters.
 
 
 37
 McMackin interviewed seventeen suggesters. Nine out of twelve suggesters sent in the names of one or more Negroes. Three told him they did not. A couple told him they did not remember. One told him it was none of his business. As to the remainder, he did not know whether they did or did not. On instructions from defense counsel he did not interview any of the suggesters from the Nashville area (Davidson County) where more than sixty-one per cent of the non-White population of the Middle District of Tennessee over twenty-one years of age reside, and where several Negroes serve as suggesters. The investigation was restricted to other counties in the Middle District in which only eight per cent of the total population over twenty-one years of age, consisted of non-White.
 
 
 38
 Ziegler interviewed nineteen suggesters. One refused to comment. Five told him that they had secured a cross-section of the community in which they resided. As to whether the suggesters returned names of Negroes on their lists, six out of twelve answered `yes'; six answered `no'. The other five thought they returned names of Negroes, or didn't remember. In most instances they answered that they considered that they had secured a fair cross-section of the community. They were personally acquainted with the persons selected.
 
 
 39
 In our judgment District Judge Wilson was justified in denying the delayed motion.
 
 
 40
 Supreme Court cases have indicated methods used to establish discrimination in the selection of jurors and to make out a prima facie case.
 
 
 41
 In Hill v. State of Texas, 316 U.S. 400, 403, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942) an assistant district attorney for the county, who had lived in Dallas County for twenty-seven or twenty-eight years and served for sixteen years as a judge in the criminal court in which Hill was convicted, testified that he never knew of a Negro being called to serve on the grand jury. The district clerk knew of no citations issued for Negroes to serve on the grand jury. Three colored witnesses, who had lived in the county from twenty-five to fifty years, testified that they had never known of a Negro being called to serve on a grand jury. Of 66,000 poll tax payers in the county, 8,000 were Negroes.
 
 
 42
 See Arnold v. North Carolina, 376 U. S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964), where only one Negro served on grand jury in twenty-four years, although Negroes comprised twenty-eight per cent of persons on the tax records.
 
 
 43
 In both of the cited cases the Supreme Court held that a prima facie case was made.
 
 
 44
 No such proof as to discrimination was proffered in the present case. It seems to us that if there had existed such an outrageous discrimination against Negroes, Catholics, Jews, blue collar workers, community civic leaders and liberals or progressives as was claimed by the defense, it would have been easy to show it in a place as heavily populated as the Middle District.[5] Not one Negro, Catholic, Jew, working man, union leader, or other alleged discriminate, was called as a witness. Instead the defense wanted to engage in a fishing expedition by calling seventy-seven suggesters with whom they had no contacts at the time, with only one exception.
 
 
 45
 Had evidence been proffered as to discrimination against any cognizable group, a prima facie case might have been made requiring the Government to go forward with rebuttal, and justifying a full scale investigation by the court. Hernandez v. Texas, supra. Until then the list was not suspect.
 
 
 46
 Appellants further contend that Judge Gray in his voir dire examination of the grand jurors made no effort to determine if the members were biased against any of the defendants. The record does not support this contention.
 
 
 47
 The Court made a preliminary statement to the veniremen.[6] The Court then read to the prospective grand jurors the oath which they would be required to take. He asked the questions set forth in the footnote.[7] After excusing one prospective juror because he might have difficulty making an independent determination since he was acquainted with persons involved in newspaper publicity, the jury was sworn.
 
 
 48
 In our judgment the voir dire inquiry was sufficient. It was not necessary that the Court furnish the jurors with the names of each person who might be investigated and direct specific inquiries as to bias and prejudice against him.
 
 
 49
 Did the Trial Court Err in Denying the Motion to Suppress the Evidence of Edward G. Partin?
 
 
 50
 Partin was Secretary-Treasurer and Business Manager of Teamsters' Local No. 5 in Baton Rouge, Louisiana. He had held that position for twelve years. He had known Hoffa closely for about five years.
 
 
 51
 The evidence sought to be suppressed was the testimony of Partin at the trial which was directed chiefly at implicating Hoffa and Appellant King with the endeavors to bribe the jurors in the Test-Fleet case.
 
 
 52
 Partin testified, over the objections of the defendants, as to conversations with Hoffa in the latter's hotel room in Nashville, at the start of and during the pendency of the trial of that case, and also as to conversations with Appellant King. No one else was present during these conversations. The gist of Partin's testimony was as follows:
 
 
 53
 On the day before the trial started, Appellant King told Partin that there was "a meeting set up on the jury that night". Partin did not go to the meeting.
 
 
 54
 On that evening Hoffa motioned to Partin to come to his room. Partin testified:
 
 
 55
 "He [Hoffa] told me he'd like for me to stick around a day or two, that he might have one or two people for me to call. He said they was going to get one juror or try to get a few scattered jurors and take their chances."
 
 
 56
 Before leaving Nashville for Baton Rouge, on October 23rd, Hoffa told Partin that when he returned he might want him "to pass something for him". Hoffa put his hand behind his back and hit his rear pocket.[8]
 
 
 57
 Partin returned to Nashville on October 25th and reminded Hoffa that he might want him to pass something for him. Hoffa replied:
 
 
 58
 "The dirty bastards went in and told the Judge that his neighbor had offered him $10,000. We are going to have to lay low for a few days."
 
 
 59
 Partin had conversations with Appellant King on October 26th in which King informed him that one of the lady jurors was married to a highway patrolman, whom he would endeavor to contact. King said that he was acquainted with a friend of the juror and would try to have the friend talk to her "to get her swayed toward Mr. Hoffa". King said "that the patrolman and his wife had money, but they loved money and $10,000 was a lot of money". King told Partin that he intended to circulate in the neighborhood where the highway patrolmen hung out and "see if they knew anyone on the jury that they could get to". King told Partin that the closest person to the highway patrolman was deer hunting in Montana.
 
 
 60
 On October 29th Hoffa requested Partin to telephone Billy Wade, an All-American football player from Nashville, "to come into town and circulate around and see if he knew anyone he could get to on the jury, and to come into the court room and shake hands and mix up with the defendants". Partin was unable to reach Wade. On that same day Hoffa told Partin, "I would pay $15,000 or $20,000, whatever it costs, to get to the jury".
 
 
 61
 On October 30th King pointed out to Partin a woman sitting in the courtroom, and said she was to speak to juror Mrs. Paschal.
 
 
 62
 On November 4th Partin met Hoffa and King in a hallway of the hotel. Hoffa told Partin he was "raising Cain at King, said he wasn't doing what he told him to do". He said that "King keeps telling me he can get the patrolman but he don't get to him", and that "He keeps talking about it and fumbling around". Later King told Partin that he thought the highway patrolman would go along and that he had arranged to meet him the following Sunday at midnight at a spring behind a farm. There was no such meeting held that Sunday.
 
 On November 7th Hoffa told Partin:
 
 63
 "I have got the colored male juror [Fields] in my hip pocket. One of my business agents Campbell came into Nashville prior to the trial and took care of it."[9]
 
 
 64
 He said the juror would not take any money but would not "go against his own people".
 
 Hoffa said:
 
 65
 "Our best bet is a hung jury unless we can get to the foreman of the jury. If they have a hung jury, it will be the same as an acquittal because they will never try the case again."
 
 
 66
 On November 14th Partin was present during a conversation between Hoffa and King. He said Hoffa was on King again about not making a contact like King told him he would and Hoffa "wanted some insurance". On the same day King told Partin that he was planning to meet the patrolman (Paschal). Partin heard Hoffa call King "a stupid s.o.b. for thumbing around and not getting the job done". On the following day Partin discussed with King "the contacts to be made with the patrolman".[10]
 
 
 67
 On November 19th King related to Hoffa the details concerning his meeting with Paschal. On the same day Hoffa told Partin he "was disturbed because the Highway Patrolman wouldn't take the money * * * if he had taken the money it would have pinned him down and he couldn't have backed up".
 
 
 68
 The ground of the motion to suppress was that the Government had planted an informer (Partin) in the midst of the defendants and their counsel, which interfered with their rights to the effective assistance of counsel in the Test-Fleet case, and was in violation of the Fourth, Fifth and Sixth Amendments to the Constitution.
 
 
 69
 The District Judge conducted an extensive hearing on the motion in the absence of the jury, at which a number of witnesses testified. The witnesses called by the defense included Partin, the attorneys for the Government, a special Assistant to the Attorney General, the District Attorney for the Ninth Judicial District in Louisiana, and his Administrative Assistant, and a number of the attorneys who represented Hoffa in the Test-Fleet case.
 
 
 70
 At the conclusion of the hearing the Court adopted findings of fact and denied the motion to suppress the evidence.[11] These findings were supplemented in the Court's memorandum denying the motion for a new trial.[12]
 
 
 71
 In substance, the Court found from the evidence that the Government did not place Partin in the midst of the defendants, but that he was there by invitation of one of the defendants (Hoffa). The Court further found that there was no interference with the attorney-client relationship of any defendant in the case.
 
 
 72
 The evidence at the hearing on the motion to suppress, disclosed that shortly before the trial of the Test-Fleet case Partin was in the East Baton Rouge Parish jail on a state kidnapping charge. The charge grew out of a family quarrel in which Partin assisted a friend, who was the father, in kidnapping his own children from his separated wife. While in jail Partin requested a meeting with the state prosecuting officials. He met with Daniels, the Administrative Assistant to State District Attorney Pitcher, and later with Pitcher, Daniels, Duffy, an Assistant U. S. District Attorney, and Grimsley, an attorney in the Criminal Division of the Department of Justice. Partin informed them of an alleged plot by Hoffa to murder Robert F. Kennedy, then Attorney General of the United States. At this meeting Pitcher told Partin that if the kidnapped children were returned unharmed he would become eligible for bond, but so long as the children were held his offense was nonbailable under Louisiana law. Shortly thereafter the children were returned unharmed and Partin was released on $5,000 bail.
 
 
 73
 After his release on bail, Partin met with Daniels at the Holiday Inn in Baton Rouge. Daniels was conducting an investigation as a state law enforcement officer. He had not been asked to do so by the Federal Government. Partin placed a number of telephone calls to different people and recorded some of them on a recording device furnished by Daniels. He recorded a call to Hoffa in Washington, in which Partin requested a meeting with Hoffa, and another one to Hoffa in New Jersey, in which Hoffa agreed to meet Partin at the hotel in Nashville where Hoffa intended to stay during the trial. These recorded telephone calls were offered in evidence by the defense. Grimsley did not ask Partin to call Hoffa.
 
 
 74
 A few days thereafter Partin met with Grimsley, the Department of Justice attorney, and Daniels in Atlanta. After discussing other matters not pertaining to this case, Grimsley asked Partin if he intended to meet with Hoffa in Nashville. Upon being advised of the appointment, Grimsley asked Partin to keep his ears and eyes open and to report any attempts at witness intimidation or jury tampering, either to Grimsley or to Walter Sheridan, a Special Consultant to the Attorney General. Grimsley gave Partin Sheridan's Nashville telephone number.
 
 
 75
 During the Test-Fleet trial Partin did telephone Sheridan frequently and advised him concerning the plans to bribe the jurors. Partin was present in the hotel on one occasion during the Test-Fleet trial when defense counsel Bufalino interviewed some truck drivers and prepared questions and answers which he asked the truck drivers to memorize. Partin related this incident to Sheridan. There was no proof that the testimony of the truck drivers was transmitted to the Government.
 
 
 76
 Partin was in and out of Nashville a number of times during the trial, looking after his own business.
 
 
 77
 It is significant that all of the conversations between Partin and Hoffa relative to jury tampering, which were sought to be suppressed, took place in the absence of counsel and with no witnesses present. The same is true with respect to Partin's conversations with Hoffa and King, and with King alone. Partin testified as to no communication between the defendants and their attorneys.
 
 
 78
 The credibility of the witnesses on the motion to suppress was for the District Judge to determine. United States v. Vita, 294 F.2d 524, 528 (C.A. 2, 1961) cert. denied 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788.
 
 
 79
 In our judgment the findings of fact of the District Judge on the motion to suppress, as supplemented by his memorandum on the motion for a new trial, were supported by substantial evidence and are not clearly erroneous. United States v. McGavic, 337 F.2d 317, 319 (C. A. 6, 1964) cert. denied 380 U.S. 933, 85 S.Ct. 940, 13 L.Ed.2d 821; Villano v. United States, 310 F.2d 680 (C.A. 10, 1962); United States v. Page, 302 F.2d 81 (C.A. 9, 1962); United States v. Mathis, 298 F.2d 790 (C.A. 6, 1962) cert. denied 370 U.S. 947, 82 S.Ct. 1595, 8 L. Ed.2d 813; Biggs v. United States, 246 F.2d 40 (C.A. 6, 1957) cert. denied 355 U.S. 922, 78 S.Ct. 364, 2 L.Ed.2d 353.
 
 
 80
 Appellants rely on Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879 (C.A.D.C.1953) cert. denied 349 U. S. 930, 75 S.Ct. 773, 99 L.Ed. 1260 and Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749 (C.A.D.C.1951) cert. denied 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690. We think both of these cases are inapposite.
 
 
 81
 In Caldwell the Government informer was present in the defense camp during the trial in which the conviction was obtained. He was hired by the Government to work in the defense camp and regularly attended meetings between defense counsel and witnesses. He reported many matters connected with the impending trial. In that case there was an interference with the attorney-client relationship. The Court recognized, however, that a surreptitious police effort "to get evidence" was proper and could not be excluded from consideration. Id. at 881 fn. 10, 75 S.Ct. 773. In Coplon the Government intercepted communications between defendant and her attorney.
 
 
 82
 We doubt that the relaying of the small amount of information relative to the truck drivers had any effect on the validity of the Test-Fleet trial. Cf. United States v. Lebron, 222 F.2d 531 (C.A. 2, 1955) cert. denied 350 U.S. 876, 76 S.Ct. 821, 100 L.Ed. 774; United States ex rel. Cooper v. Denno, 221 F.2d 626 (C.A. 2, 1955) cert. denied 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289. Partin was not asked to testify as to truck drivers' statements in the present trial. There was no proof that he had read the statements or knew what was in them.
 
 
 83
 But we are not called upon in this case to determine the effect of Partin's activities on the Test-Fleet trial. The present trial for jury tampering involved an entirely different and unrelated offense. This also distinguishes Caldwell and Coplon, which involved the effect of illegality on the first trials
 
 
 84
 The attorney-client relationship would offer no shield to either client or attorney if the client had been engaged in a plan to commit a crime in the future. Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933); Sawyer v. Barczak, 229 F.2d 805, 809 (C.A. 7, 1956) cert. denied 351 U.S. 966, 76 S.Ct. 1025, 100 L.Ed. 1486, rehearing denied 352 U.S. 860, 77 S.Ct. 24, 1 L.Ed. 2d 70; United States v. Weinberg, 226 F.2d 161, 172 (C.A. 3, 1955) cert. denied 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815.
 
 
 85
 Appellants urge that the testimony of Partin should have been suppressed because it was illegally obtained, being "the ill-gotten `fruit of the poisoned tree'". They cite Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). They state that this sanction is necessary to deter the Government from engaging in an unconstitutional invasion of the right to counsel.
 
 
 86
 But we have pointed out that there was no invasion by the Government of the defendants' right to counsel. Even if the evidence were tainted (which it was not), it could only affect the validity of the Test-Fleet trial and not a subsequent trial for a different offense. In Caldwell the Court quoted from Coplon to the effect that Government interception of communications between a defendant and his attorney —
 
 
 87
 "* * * invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial." Caldwell v. United States, supra, at p. 881 of 205 F.2d.
 
 
 88
 In Coplon the Court directed "a new trial at which the accused can be free of surreptitious interception * * *." Id. 191 F.2d at page 760. This indicates rather clearly that the Court did not regard the interception as preventing a retrial of the case. The same is true in Caldwell where a new trial was ordered.
 
 
 89
 In Martin v. United States, 335 F.2d 945 (C.A. 9, 1964) and United States v. Guerra, 334 F.2d 138 (C.A. 2, 1964) cert. denied 379 U.S. 936, 85 S.Ct. 337, 13 L.Ed.2d 346, the Courts held that illegal conduct occurring at the first trial did not taint all subsequent proceedings. United States v. McGavic, supra; Rogers v. United States, 330 F.2d 535 (C.A. 5, 1964) cert. denied 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186; Burke v. United States, 328 F.2d 399 (C.A. 1, 1964) cert. denied 379 U.S. 849, 85 S.Ct. 91, 13 L.Ed. 2d 52.
 
 
 90
 Appellants argue that the evidence was obtained by fraud and artifice. Even if true, this would not render it inadmissible. Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); United States v. Thomas, 303 F.2d 561 (C.A. 6, 1962); Wellman v. United States, 227 F.2d 757, 770 (C.A. 6, 1955) rev'd on other grounds, 354 U.S. 931, 77 S.Ct. 1403, 1 L.Ed.2d 1535.
 
 
 91
 In Olmstead v. United States, 277 U. S. 438, 468, 48 S.Ct. 564, 72 L.Ed. 944 (1928) the Court stated that evidence obtained by the use of informers "has always been received".
 
 
 92
 The testimony of Partin sought to be suppressed related not to trial strategy in the Test-Fleet case, but to illegal endeavors to bribe or influence jurors. Informing the Government of the existence of such evidence did not interfere with the rights of Appellants to the effective assistance of counsel. They had no lawful right to engage in such conduct, either with or without the assistance of counsel. There was no evidence here that counsel knew anything about the unlawful endeavors.
 
 Prior Inconsistent Statements of Witnesses
 
 93
 The fact that a witness may have made prior sworn or unsworn statements, inconsistent with his testimony at the trial, does not require the exclusion of his testimony.
 
 
 94
 In the present case witnesses were cross-examined extensively by the defense, not only concerning alleged prior inconsistent statements but also concerning their motives. In particular Partin was cross-examined at great length concerning many incidents which took place during his life, including his taking the Fifth Amendment before the Grand Jury, his criminal record, and the pending untried charges against him. The jury was fully informed as to his record.
 
 
 95
 The credibility of the witnesses was for the jury to determine. United States v. Aviles, 274 F.2d 179 (C.A. 2, 1960) cert. denied 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009, 362 U.S. 982, 80 S.Ct. 1068, 4 L.Ed.2d 1015, rehearing denied 363 U.S. 858, 80 S.Ct. 1610, 4 L.Ed. 2d 1739; United States v. Reina, 242 F.2d 302, 307 (C.A. 2, 1957); Henderson v. United States, 218 F.2d 14, 17, 50 A. L.R.2d 754 (C.A. 6, 1955) cert. denied 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253, rehearing denied 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290.
 
 
 96
 The jury could also consider the alleged threats to a witness. Enriquez v. United States, 314 F.2d 703 (C.A. 9, 1963); Nichols v. United States, 276 F.2d 147, 148 (C.A. 6, 1960) cert. denied 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 47.
 
 Surveillance
 
 97
 Appellants contend that they were denied the effective assistance of counsel because of surveillance conducted by the Government during the course of the trial. The trouble is that the claim is not supported by the evidence.
 
 
 98
 The trial judge conducted a hearing on this matter at the close of the trial. The defense called a number of witnesses at the hearing, including agents of the F.B.I., attorneys for the defendants, and one, Bernard B. Spindel, an electronics expert employed by one of the defendants, who specialized in detection, listening and monitoring devices. The hearing consumed two full trial days, and is contained in two hundred pages of the record.
 
 
 99
 The trial judge found that the evidence failed to establish any surveillance by Government agents, of the defendants, their attorneys or witnesses, or any interference with the defendants and their counsel.
 
 
 100
 In his memorandum denying the motion for a new trial, the trial judge pointed out that:
 
 
 101
 "The only surveillance shown by the record was (1) observations made by the F.B.I. during the period prior to the completion of the selection of the jury of four individuals (George E. Hix, John Cleveland, William A. Test, and Charles L. O'Brien), who were neither parties nor attorneys, nor witnesses in the case but were connected with the Teamsters organization; (2) the surveillance by the F.B.I. of one Bernard Spindel, a person having a reputation in the field of telephonic and electronic interceptions who came to Chattanooga from New York during the trial; and (3) surveillance of the F.B.I. by said Spindel on behalf of the defense by interception of F.B.I. radio communications."
 
 
 102
 An examination of the record convinces us that these findings of fact of the District Judge were supported by substantial evidence and are not clearly erroneous.
 
 
 103
 The time for conducting the hearing was within the discretion of the Judge. We find no abuse of discretion.
 
 
 104
 Motion for Continuance of Trial on Account of Newspaper Publicity
 
 
 105
 The District Court ordered transfer of the case for trial to Chattanooga on account of the newspaper publicity in Nashville. A motion for continuance was made on account of newspaper publicity in Chattanooga.
 
 
 106
 The newspaper publicity was not all adverse to Hoffa. Some of it contained statements made on behalf of Hoffa by his own counsel.
 
 
 107
 The Court found that the newspaper publicity did not have prejudicial context; that most of it did not relate to the issues of the case; and that some of it related to pre-trial procedures and trial preparations.
 
 
 108
 The voir dire examination of the prospective jurors consumed about five days. They were questioned at great length by counsel for the defendants. The examination did not disclose that the prospective jurors had been influenced by newspaper publicity.
 
 
 109
 The matter of continuance rested within the sound discretion of the trial judge. We find no abuse of discretion in the denial of the motion for a continuance.
 
 
 110
 Appellants further complained about the number of Deputy United States Marshals attending the trial. They were dressed in plain clothes. After the jury was empaneled the Court limited the number to four. The Court had the right to provide for the presence of Deputy United States Marshals for the protection of witnesses, parties, jurors, and to insure court room decorum. This involved a discretionary matter, which we do not find was abused.
 
 
 111
 Was the Testimony of Prospective Juror Tippens with Respect to the Bribery Offer Made to Him by Medlin Inadmissible as Hearsay Evidence?
 
 
 112
 Count II of the indictment charged Medlin as a principal, and Hoffa as an aider and abettor, in offering the bribe of $10,000 to prospective juror Tippens if he would vote for acquittal of Hoffa in the Test-Fleet case.
 
 
 113
 As before stated, Medlin was granted a separate trial when this Court, by writ of mandamus, ordered his case retransferred to Nashville. The case proceeded against Hoffa alone on Count II.
 
 
 114
 Tippens had been seated in the jury box as juror No. 12 in the Test-Fleet case and had been passed by the Government.
 
 
 115
 The Court in the present case would not allow Tippens, who was called as a witness by the Government, to testify as to the content of his conversation with Medlin, in the absence of Hoffa, which he ruled was inadmissible. The content was proffered by the Government. Tippens was allowed to testify only as to the fact of the conversation and the matter of any report which he made to Judge Miller (the trial judge in the Test-Fleet case) which would be received only insofar as the same might or might not tend to corroborate Partin's testimony as to alleged statements made by Hoffa to Partin.
 
 
 116
 The Court permitted the Government to read to the jury, as a court record, the transcript of a statement made by Judge Miller at a conference in his chambers in the Test-Fleet case, in which the judge advised Hoffa and his attorneys and the attorneys for the Government, of the substance of Tippen's report concerning Medlin's activities. The Court ruled that the evidence could be considered only as it might tend to corroborate Partin's testimony.
 
 
 117
 Appellant's position is that this evidence was pure hearsay and inadmissible for any purpose against any defendant, and that it was prejudicial error for the court to admit it.
 
 
 118
 If Medlin had been tried with Hoffa on Count II, the evidence would certainly have been admissible against Medlin. If Medlin had died or was unavailable for trial, the Government could still proceed against Hoffa alone as an aider and abettor. The charge against Hoffa, as an aider and abettor, was not expiated by reason of the inability of the Government to proceed in the same case against Medlin.
 
 
 119
 Before Hoffa could be convicted as an aider and abettor, however, it was necessary for the Government to prove that the principal, Medlin, committed the crime. Shuttlesworth v. City of Birmingham, 373 U.S. 262, 265, 83 S.Ct. 1130, 10 L.Ed.2d 335 (1963); Hendrix v. United States, 327 F.2d 971, 975 (C.A. 5, 1964); Edwards v. United States, 286 F.2d 681 (C.A. 5, 1960); Karrell v. United States, 181 F.2d 981 (C.A. 9, 1950).
 
 
 120
 The only way open for the Government to prove that a crime had been committed was by the testimony of Tippens, who was the recipient of the bribe offer, as no witnesses were present when the bribery was attempted. Bribery attempts are not ordinarily made in public.
 
 
 121
 The corpus delicti of the crime was the offering of the bribe by Medlin to the juror Tippens. It would not, in our judgment, violate the hearsay evidence rule for the Government to prove the corpus delicti by having Tippens narrate the facts concerning the crime committed by Medlin, which necessarily had to include his conversation with Medlin. The proof of the corpus delicti did not implicate any of the defendants.
 
 
 122
 After establishing that a crime had been committed, the Government had the burden to connect Hoffa with it as an aider and abettor. This the Government endeavored to do by the testimony of Partin concerning the statements made to him by Hoffa shortly prior to and during the course of the Test-Fleet trial, from which the jury might draw inferences as to Hoffa's participation in the crime. These statements were not only admissible as to Count II, but also as to Counts III, IV and V. They were probative evidence of his intent, plan and design. We realize that Hoffa, when called as a witness, denied the statements attributed to him by Partin; but it was for the jury to decide whether to believe Hoffa or Partin.
 
 
 123
 Thus the testimony of Tippens was admissible as evidence to establish that a crime had been committed. It was also admissible for the purpose stated by the District Judge, namely, insofar as it might or might not tend to corroborate the testimony of Partin as to the alleged statements made to him by Hoffa. Considerable latitude must be allowed in the admission of corroborative evidence. 98 C.J.S. Witnesses § 648.
 
 
 124
 We think the District Court erred in restricting the Government's proof. The error resulted in a dismissal of Count II of the indictment. Since the error was favorable to Hoffa, he cannot complain.
 
 
 125
 It follows that inasmuch as the proof admitted was less than what the Government was entitled to present, there was no error in admitting the limited evidence.
 
 Conspiracy
 
 126
 Appellants complain about the trial court's instructions to the jury, which were given from time to time during the progress of the trial in connection with the introduction of evidence of out-of-court statements of some of the defendants and others who, the Government's proof tended to show, were jointly engaged in the commission of the bribery endeavors. These instructions were on the subjects of conspiracy and principal and agent. It is argued that since Count I of the indictment charging conspiracy was severed by order of the Court, evidence of a conspiracy in connection with the proof of the substantive offenses was inadmissible and that it was prejudicial error for the Court to define that term to the jury.
 
 
 127
 The trial judge submitted to the jury only the substantive offenses charged in the indictment. He did not submit the crime of conspiracy, nor tell the jury that conspiracy was a separate offense.
 
 
 128
 Even though Congress has created a separate crime of conspiracy, it is settled that joint participators in the commission of the substantive offenses may be denominated as conspirators. Kumpe v. United States, 250 F.2d 125 (C.A. 5, 1957). The conspiracy may be shown as an evidentiary fact to prove participation in the substantive crime. 16 Am.Jur.2d, Conspiracy, § 38, p. 147 (1964).
 
 
 129
 It was the function of the Court to define the term `conspiracy' and to instruct the jury as to the circumstances under which the out-of-court statements were admissible.
 
 
 130
 In our judgment the Court's definition of conspiracy was correct. He further instructed the jury that they could consider an out-of-court statement only as to the particular defendant who made the statement, until and unless the jury was satisfied from other evidence in the case that the defendant making the statement was a co-conspirator of one or more of the other defendants, in which event the jury could consider such evidence against any other defendant shown by such other evidence to have been a co-conspirator. The Court made it clear that the other evidence could not consist of hearsay declarations. The Court also instructed the jury that statements made by an agent within the scope of his authority were admissible not only against the agent but also against his principal.
 
 
 131
 Appellants contend that the Court should have determined as a matter of law whether there was proof aliunde of joint conspiracy instead of submitting it to the jury. They rely on Carbo v. United States, 314 F.2d 718 (C.A. 9, 1963) cert. denied 377 U.S. 953, 84 S.Ct. 1626, 12 L.E.2d 498, and United States v. Dennis, 183 F.2d 201 (C.A. 2, 1950) aff'd 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. The Court submitted the factual issue to the jury rather than determine it as a matter of law. United States v. Dorsey, 290 F.2d 893 (C.A. 6, 1961) cert. denied 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed. 2d 29; Continental Baking Co. v. United States, 281 F.2d 137 (C.A. 6, 1960); Schmeller v. United States, 143 F.2d 544 (C.A. 6, 1944).
 
 
 132
 We think there was sufficient evidence to make out a prima facie case linking Appellants with the conspiracy and the Court would have been justified in so holding in accordance with the rule of Carbo and Dennis. Submitting the issue to the jury instead of determining it as a matter of law was more favorable to the Appellants and they were not prejudiced thereby. United States v. Stromberg, 268 F.2d 256 (C.A. 2, 1959) cert. denied 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed. 2d 102. There was substantial evidence that the out-of-court statements were made in furtherance of the conspiracy.
 
 
 133
 The Court's instructions, in our judgment, properly limited the jury's consideration of the evidence. He repeated them on several occasions and referred to them many times as the evidence was offered. The Court further charged the jury that —
 
 
 134
 "Each defendant is entitled to have his case determined from his own acts and statements, and from other evidence in the case which may be applicable to him, or be admitted by the Court as to him."
 
 
 135
 Only three counts of the indictment were submitted to the jury. The jury returned a not guilty verdict on Count IV and guilty verdicts on Counts III and V. We think that the jury understood the Court's instructions and was not confused or misled by them.
 
 
 136
 Since the Court had repeated or referred to his instructions relative to the out-of-court statements many times during the trial, it was not necessary for him to advert to them again in his final instructions to the jury.
 
 Joinder of Offenses and Defendants
 
 137
 Appellants contend that there was a misjoinder of offenses and defendants in the indictment which operated to their prejudice during the trial, and that the Court erred in denying their motions for severance.
 
 
 138
 Joinder of offenses and defendants is governed by Rule 8 of the Federal Rules of Criminal Procedure. Rule 8(a) relates to joinder of offenses. It authorizes joinder —
 
 
 139
 "* * * if the offenses charged * * * are of the same or similar character or are based on * * * two or more acts or transactions connected together or constituting parts of a common scheme or plan."
 
 
 140
 Counts II, III and V charged offenses of the same character, namely, endeavors to influence different jurors in the Test-Fleet case, in which only Hoffa was on trial. Count IV alleged an offense of similar character, namely, to obstruct justice in that trial. The obstruction of justice related to activities concerning a juror.
 
 
 141
 Hoffa was named in all counts. He was the only defendant on trial under Count II. In addition to Hoffa, Campbell and Parks were named in Count III, Dorfman and Tweel in Count IV, and King in Count V. All four counts involved the violation of the same statute, 18 U.S.C. § 1503. The joinder of offenses, in our opinion, came clearly within the provisions of Rule 8(a). United States v. Koury, 319 F.2d 75 (C.A. 6, 1963).
 
 
 142
 Castellini v. United States, 64 F.2d 636 (C.A. 6, 1933), relied on by Appellants, is not in point. It was decided prior to the adoption of the Federal Rules of Criminal Procedure and involved a statute which did not authorize consolidation of counts involving different defendants. (Id. 636, 637, 721) It was distinguished in Ross v. United States, 197 F.2d 660 (C.A. 6, 1952) cert. denied 344 U.S. 832, 73 S.Ct. 40, 97 L.Ed. 648.
 
 
 143
 Rule 8(b) authorizes joinder of defendants —
 
 
 144
 "* * * if they are alleged to have participated * * * in the same series of acts or transactions constituting an offense or offenses."
 
 
 145
 "[They] may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."
 
 
 146
 It seems to us that the acts of the defendants were certainly connected, Kivette v. United States, 230 F.2d 749 (C.A. 5, 1956) cert. denied 355 U.S. 935, 78 S.Ct. 419, 2 L.Ed.2d 418, or factually related, Williamson v. United States, 310 F.2d 192 (C.A. 9, 1962). They all concerned endeavors to influence jurors in the Test-Fleet trial. They were all committed in the same locality and during the course of that trial. They all had a common objective, namely, to prevent a guilty verdict against Hoffa.
 
 
 147
 The fact that evidence may be admissible against one defendant, but not against others does not require separate trials. Such a situation is usually present in joint trials. Rizzo v. United States, 304 F.2d 810 (C.A. 8, 1962) cert. denied 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed. 2d 123.
 
 
 148
 In passing upon the various motions for severance, the District Court was required to exercise its discretion. We do not find that it was abused or that defendants were prejudiced by the denial of those motions. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954).
 
 The Alleged Fraud on the Grand Jury
 
 149
 Appellants contend that the Government perpetrated a fraud on the Grand Jury by subpoenaing Partin and his claiming that answering questions would incriminate him. They argue that the indictment should have been dismissed or quashed. The evidence does not support this charge.
 
 
 150
 It should be noted that after receipt of the subpoena, Partin took up the matter with one of Hoffa's attorneys, Bufalino, who advised him to take the Fifth Amendment, and instructed him how to do it. He also discussed the matter with a Nashville lawyer, to whom he had been referred by Bufalino, and who gave him the same advice. There was no evidence that Partin had been instructed by the Government to claim his constitutional privilege. Partin testified that he acted on the instructions of Bufalino. The Government further states that Partin was not the only witness who took the Fifth Amendment. Fourteen other witnesses did so. It offered to permit in camera inspection of the Grand Jury transcript by the Court to substantiate this point.
 
 
 151
 We cannot assume improper conduct on the part of Government agents in the absence of evidence. Partin had the constitutional right to invoke the Fifth Amendment.
 
 
 152
 Even though he had been acting as a Government informer, the Grand Jury could have indicted him for his activities in connection with the offense charged in Count IV.
 
 
 153
 The Government was not obligated to call Partin as a witness before the Grand Jury, much less to persuade him to testify, even assuming that it might have been able to do so.
 
 Competency of Evidence to Warrant
 Indictment
 
 154
 It is further contended that without the testimony of Partin there was no competent evidence before the Grand Jury to support the indictment of Hoffa. This would not justify quashing the indictment. Martin v. United States, 335 F.2d 945 (C.A. 9, 1964). Hearsay evidence is sufficient. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).
 
 Disclosure of Grand Jury Minutes
 
 155
 We find nothing irregular in the limited disclosure of Grand Jury minutes to the Special Consultant to the Attorney General and the agents of the F.B.I. who were working on the case. Fed.R.Crim.P. 6(c).
 
 
 156
 If the disclosures were unauthorized, any violators of the Rule could be punished for contempt, but dismissal of the indictment would not be justified. United States v. United States District Court for Southern Dist. of W. Va., 238 F.2d 713, 721-722 (C.A. 4, 1956) cert. denied 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365.
 
 Sufficiency of Indictment
 
 157
 We think the indictment charging Hoffa as an aider and abettor was sufficiently definite. It was not necessary to particularize the acts constituting the aiding and abetting. One who aids and abets in the commission of a crime is just as guilty as the principal. The indictment did describe the principal offenses, which is all that was necessary. Coffin v. United States, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1895); United States v. Simmons, 96 U.S. 360, 24 L.Ed. 819 (1877); Ellis v. United States, 321 F.2d 931 (C.A. 9, 1963).
 
 Production of Grand Jury Minutes
 
 158
 Appellants contend that the District Court erred in not ordering the production of the Grand Jury minutes containing the testimony of the witness Partin, which they desired to use for impeachment purposes in connection with their cross-examination.
 
 
 159
 On direct examination of Partin, no questions were asked of him concerning his testimony before the Grand Jury. The defense brought out on cross-examination the fact that Partin had appeared before the Grand Jury and refused to answer questions on the ground of self-incrimination.
 
 
 160
 It is claimed that Partin's invoking the privilege against self-incrimination before the Grand Jury was inconsistent with the fact that he testified at the trial and therefore the minutes should have been furnished to the defense for impeachment purposes.
 
 
 161
 When the question was presented, the District Court required the production of the Grand Jury minutes for in camera inspection. The Court declared a recess and read the transcript. He then determined from his in camera inspection that the minutes were not subject to production.
 
 
 162
 We have read the transcript and are of the same opinion.
 
 
 163
 There was no inconsistency in the testimony of Partin on the subject of the Fifth Amendment. He admitted on cross-examination that he had invoked the privilege against self-incrimination before the Grand Jury. It was not necessary to introduce the Grand Jury minutes to prove the same thing which was already admitted and was before the jury. Admitting the transcript would be merely cumulative evidence on a matter which was not in dispute.
 
 
 164
 Invoking the constitutional privilege against self-incrimination before a Grand Jury does not give rise to an inference that the witness has done something wrong or that he is guilty of an offense. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).
 
 
 165
 It is debatable whether the Court should have allowed any cross-examination relative to the witness' taking the Fifth Amendment. In permitting cross-examination on the subject, the Court certainly accorded the defendants everything to which they were entitled.
 
 
 166
 When the Court determined that there was no inconsistency, he was not obliged to turn over the Grand Jury minutes to the defense. United States v. Keegan, 331 F.2d 257 (C.A. 7, 1964) cert. denied 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed.2d 37; United States v. Giampa, 290 F.2d 83 (C.A. 2, 1961).
 
 
 167
 We find nothing irregular or prejudicial in the fact that Appellants Parks, Campbell and King were subpoenaed before the Grand Jury. No claim is made that they were not advised as to their rights. United States v. Annunziato, 293 F.2d 373 (C.A. 2, 1961) cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134.
 
 
 168
 Sufficiency of the Evidence to Support Convictions of Hoffa and Campbell
 
 
 169
 Appellants contend that giving full credence to Partin's testimony and the other evidence in the case, it was sufficient to convict Hoffa and Campbell on Count III of the indictment. We do not agree.
 
 
 170
 In determining whether the motions for judgments of acquittal should have been granted, we are required to consider the evidence in the light most favorable to the Government. United States v. Decker, 304 F.2d 702, 705 (C.A. 6, 1962).
 
 
 171
 There can be no question but that endeavors were made to tamper or bribe, not merely one juror, but at least three of the jurors in the Test-Fleet case. A number of persons participated in the illegal acts. The result of the trial was a "hung jury". The question here is whether Hoffa and Campbell were linked with the endeavors by sufficient evidence.
 
 
 172
 (A) Hoffa
 
 
 173
 Hoffa was the only defendant in the Test-Fleet case. He was the only person who could possibly benefit from the jurytampering activities. The obvious purpose of the activities was to prevent a verdict of guilty. Hoffa thus had "a stake in the venture". Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943).
 
 
 174
 Hoffa was most certainly linked with the illegal activities by the testimony of Partin, which we have heretofore detailed. The statements of Hoffa to Partin were made during the progress of the Test-Fleet trial, when the unlawful acts were being committed. These statements, if they are to be believed, indicated much more than mere knowledge on the part of Hoffa as to what was going on.
 
 
 175
 It was for the jury to decide whether to believe Hoffa or Partin. In so doing, the jury had the right to consider all of the evidence in the case, including inferences properly deducible therefrom.
 
 
 176
 We think that the jury could reasonably have concluded from the evidence that the large scale endeavors at jury tampering were not brought about by spontaneous action of the other participants who derived no benefit therefrom and were risking criminal prosecution; and that the endeavors resulted from instigation, careful planning and agreement in which Hoffa was an active participant.
 
 
 177
 (B) Campbell
 
 
 178
 Campbell was a business agent of Local 299, a Teamsters Union in Detroit. He was a nephew of Appellant Parks. The Government claimed that Campbell was the intermediary between Hoffa and Parks.
 
 
 179
 Partin testified that Hoffa told him that he (Hoffa) had the Negro juror Fields in his hip pocket, and that Campbell came to Nashville and took care of it.
 
 
 180
 The Government concedes that this statement may not be considered unless Campbell was connected with the conspiracy by other evidence.
 
 
 181
 Parks was connected as an active participant in the offense by positive evidence of eye witnesses. Parks told Carl Fields, son of the juror Gratin Fields, that he needed certain information from Carl about his father because he had to make a call to Louisville by nine o'clock. This was admissible as an exception to the hearsay rule, because it was a statement as to Parks' intent to do an act, as evidence of the probable doing of it. Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); Rogers v. United States, 334 F.2d 83 (C.A. 5, 1964).
 
 
 182
 Campbell had left his home in Detroit for Louisville about two days before the commencement of the Test-Fleet trial. During October and November, 1962, he remained in Louisville for about twenty-eight days, staying at Mrs. Brown's Guest House. Parks came to Louisville once or twice during this time and met Campbell. Campbell told Mrs. Brown that he "might have to go to Nashville, and if so he would return over the weekend".
 
 
 183
 A lady companion who testified that she was with Campbell on a daily basis, said that they were both relaxing and she did not observe him doing any work. He told her that "his boss was in trouble".
 
 
 184
 Parks called Campbell on the telephone from Nashville the night before the trial started. Shortly thereafter, which was past midnight in Detroit, Campbell called Hoffa's residence in Detroit twice from a pay telephone in Louisville, paying cash for the call although he had a Union credit card. Ten minutes after the second telephone call, Campbell received a telephone call at the same pay station, which was made from a pay station in Detroit near Hoffa's residence, and which was charged to the credit card of Local 299. After that call had been completed, a call was made from the same pay station in Detroit to Hoffa's room in a Nashville hotel. That evening Campbell called Parks in Nashville and placed calls for him on each of the following two days from pay telephones.
 
 
 185
 During an eleven day period between October 22nd and November 14th, Campbell called Parks fifteen times from Louisville and twice from Detroit. Eleven of the calls were from phone booths in Louisville and one from a pay phone. All twelve calls were paid by Campbell in cash. Campbell received two telephone calls at pay telephones in Louisville from pay telephones in Detroit, and shortly thereafter calls were made to Hoffa's hotel room in Nashville.
 
 
 186
 The Government offered no proof as to the subject matter of the telephone calls. Campbell testified that they related to Union or family matters.
 
 
 187
 The jurors were not concluded by Campbell's explanation of the telephone calls. The jury had the right to consider the evidence as to the telephone calls along with the other evidence in the case and in connection with the efforts at the time of Parks and Walker, a Nashville police officer, to approach the juror Gratin Fields. They could consider the timing and number of the telephone calls, and the fact that some were made from and to pay booths, and most of them paid for in cash.
 
 
 188
 The evidence was circumstantial. The jury could infer that Campbell was in constant communication with the conspirator Parks and that Campbell reported thereon to Hoffa by way of Detroit.
 
 
 189
 Once a conspiracy has been established, only slight evidence is necessary to connect a defendant with it. Poliafico v. United States, 237 F.2d 97, 104 (C.A. 6, 1956) cert. denied 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597; United States v. Gosser, 339 F.2d 102, 110 (C.A. 6, 1964).
 
 Other Claimed Errors
 
 190
 1 Alleged Limitation of Cross-Examination of Partin.
 
 
 191
 Although Partin was cross-examined for a period beginning February 6, 1964 and running through February 12, 1964, the defendants claim that their right of cross-examination was unduly restricted. The record does not sustain this contention.
 
 
 192
 The defense asserts that the Court did not allow them to cross-examine Partin concerning the recordings and transcripts of Partin's two telephone conversations with Hoffa. These were made available to the defense before Hoffa took the witness stand. They were offered in evidence by the defense, read to the jury and commented on in oral argument.
 
 
 193
 At no time after the recordings were made available to the defense did they ask permission of the Court to cross-examine Partin relative thereto, although Partin "was present and produced in the court room as late as the final day of testimony before the jury". (Finding Trial Court app. 340(a)).
 
 
 194
 The Court did not err in restricting the cross-examination of Partin relative to the alleged threat of Hoffa to kill Attorney General Kennedy. This was a collateral matter, the disclosure of which to the jury would in our judgment have been extremely prejudicial to the defendants. They did not all agree to waive any prejudice which might have resulted from the disclosure. (App. 1548(a)). Had Hoffa been permitted to conduct such an inquiry, he would then have been entitled to offer testimony to refute or rebut the testimony of Partin which he had thus elicited, and the trial would have been diverted into a determination of immaterial and extraneous matters. The Court did permit cross-examination of Partin with respect to any promises or threats which would influence his testimony, and allowed a wide latitude with respect to many other matters. It was within the discretion of the Court to limit cross-examination relative to collateral matters. Lohman v. United States, 266 F.2d 3 (C.A. 6, 1959) cert. denied 361 U.S. 923, 80 S.Ct. 290, 4 L.Ed. 2d 239.
 
 
 195
 We find no error in the admission of the Government's rebuttal testimony concerning Partin's reputation for truth and veracity.
 
 2 Privilege of Mrs. Partin
 
 196
 The defense called Mrs. Partin as a witness for the purpose of proving "that Partin's numerous encounters with the law and domestic troubles arose from and were created by drug addiction and association and residence with strange women".
 
 
 197
 After Mrs. Partin was sworn as a witness, she asked the Court:
 
 
 198
 "I would either like to retain counsel or either ask you if I have the privilege * * * to not testify. Can I use my privilege?"
 
 
 199
 The Court excused the jury and appointed a lawyer to represent her. The lawyer reported to the Court that she did not want to testify. In answer to a question by the Court as to whether she was claiming her privilege, she answered, "I do not want to testify".
 
 
 200
 The Court did not require her to testify. We think her testimony was privileged; E. g. Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); Brunner v. United States, 168 F.2d 281 (C.A. 6, 1948); that the privilege was sufficiently invoked; that Partin did not consent to the admission of his wife's testimony; and that the proffered testimony in any event was not admissible. Partin had not been convicted of any narcotics offense nor of adultery. There was no evidence that Partin was under the influence of narcotics when he reported to Sheridan or when he testified as a witness. The calling of Mrs. Partin as a witness was an attempt to impeach Partin by testimony upon collateral matters. The proffered testimony was inadmissible. Foster v. United States, 282 F.2d 222 (C.A. 10, 1960).
 
 3. Destruction of F.B.I. Interview Notes
 
 201
 In connection with the cross-examination of the witnesses Walker and Fields, the Government pursuant to the requirements of 18 U.S.C. § 3500 furnished to the defense written statements signed by these witnesses and F.B.I. reports relating to interviews with them. When the defense learned that the original notes from which the statements and reports had been prepared were destroyed, they moved to strike the testimony of the witnesses, or in the alternative for a mistrial. The District Court conducted a hearing on the motion.
 
 
 202
 The evidence disclosed that Walker was interviewed twice by F.B.I. Agent Sheets. In the first interview Sheets took notes, a portion of which were in long hand, and some in shorthand. These notes were not read to the witness, nor approved by him. Sheets prepared a typewritten statement from the notes, which the witness read, approved and signed. Sheets also prepared a report of the interview. He testified that both the statement and the report contained substantially the same information as his notes. After the typewritten statement was approved and signed and the report prepared, he destroyed the notes in accordance with the regular practice of his department.
 
 
 203
 Fields was interviewed by Agents Sheets and Steele. Sheets took notes of the interview. There was no evidence that Fields ever read or approved the handwritten notes. Sheets prepared a typewritten statement and report from his notes. Fields read, approved and corrected the typed statement where indicated, and signed it. The notes were then destroyed.
 
 
 204
 At the conclusion of the hearing the District Court ruled that only the signed statements and reports were producible and denied the alternative motions.
 
 
 205
 The defense had available for impeachment purposes the signed typed statements of both witnesses and the F.B.I. reports. The typed statements and reports embodied the substance of the interview notes. The agent was not required to preserve his longhand or shorthand notes or other memoranda from which he prepared the witnesses' typewritten statements. There is nothing to suggest bad faith in what the agent did. Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); United States v. Aviles, 337 F.2d 552 (C.A. 2, 1964); United States v. Spatuzza, 331 F.2d 214 (C.A. 7, 1964) cert. denied 379 U.S. 829, 85 S.Ct. 58, 13 L.Ed. 2d 38; Ogden v. United States, 323 F.2d 818 (C.A. 9, 1963) cert. denied 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86.
 
 
 206
 The question was one of fact for determination by the District Judge, whose decision we may not disturb unless clearly erroneous. Gosser v. United States, 339 F.2d 102, 113 (C.A. 6, 1964). In our opinion the ruling was supported by substantial evidence and is not clearly erroneous.
 
 4 The Sheridan Cryptic Notes
 
 207
 Walter J. Sheridan was a Special Consultant to the Attorney General. He was not a lawyer. He was called as a witness by the defense in connection with their motion to suppress the testimony of Partin, which motion was heard in the absence of the jury.
 
 
 208
 Sheridan testified among other things that Partin reported to him on the jury tampering activities during the Test-Fleet trial. He made "cryptic" notes of these conversations. Six or seven months later Sheridan reduced some of the material in the notes to typewritten form. Pursuant to request of the defense, the cryptic notes and typewritten sheets were turned over to the court for in camera inspection. The Court made an inspection, and denied the defense motion to produce them. We have also examined the notes and sheets and agree that they were not producible.
 
 
 209
 This material was not discloseable to the defense under 18 U.S.C. § 3500. It did not purport to be a substantial verbatim record of conversations between Partin and Sheridan. It was never examined, approved nor adopted by Partin. The District Court was correct in ruling from the evidence that this did not constitute a statement of Partin within the meaning of 18 U.S.C. § 3500.
 
 
 210
 It could not be used as a statement of Sheridan because in that particular proceeding he was testifying as a defense witness. The Government attempted to call Sheridan as a rebuttal witness but the Court sustained defense objections thereto.
 
 
 211
 The claim of the Appellants is that apart from the Jencks Act (18 U.S.C. § 3500), they were entitled to inspect Government records to ascertain whether Government evidence was "tainted" by leads obtained from illegal activities.
 
 
 212
 Congress passed 18 U.S.C. § 3500 because the decision of the Supreme Court in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) was being extended into areas far more sweeping than Jencks and under circumstances far removed from that case. In construing the statute the Supreme Court held that the statements must be producible under the Act or they cannot be produced at all. Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).
 
 
 213
 But we have held that the Government's evidence was not tainted; that Partin was not placed in the midst of the defense by the Government but by agreement with Hoffa; and that there was no interference in the attorney-client relationship.
 
 
 214
 The Government did produce its informant, who was alleged to have been engaged in illegal activities and was cross-examined at great length. It also offered to produce the testimony of Walter Sheridan.
 
 
 215
 It was not necessary to produce Government reports to establish that no evidence had been obtained by illegal telephone interception. The recordings were by permission of the sender, and were lawful. They did not violate 47 U.S.C. § 605. The Government could have introduced them in evidence. Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); Lindsey v. United States, 332 F.2d 688 (C.A. 9, 1964).
 
 
 216
 The defense must not have thought that the recordings were damaging because they offered them in evidence. The only material evidence which they disclosed was the arrangements with Hoffa for Partin's proposed trip to Nashville.
 
 
 217
 Both Partin and Daniels, who listened in on two telephone conversations, reported the substance thereof to the Government. The Court found that the Government's evidence was obtained from independent sources rather than from the recordings.
 
 
 218
 In our judgment the rulings of the District Court were supported by substantial evidence and were not clearly erroneous. Gosser v. United States, supra.
 
 5 The Petit Jury
 
 219
 On the first day of the trial Appellants filed motions to strike the array of two hundred prospective petit jurors. At that time seventy-six jurors were sitting in the courtroom awaiting voir dire examination. The Court heard extensive oral arguments and denied the motions without taking testimony. The grounds for the ruling were that the motions had not been timely filed and that no showing was made which entitled Appellants to a hearing.
 
 
 220
 Rule 12(b) (2) of the Federal Rules of Criminal Procedure required motions of this type to be filed before trial. Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948).
 
 
 221
 The purpose of the rule undoubtedly was to prevent the diversion of a trial by protracted excursions into preliminary matters at a time when the witnesses and jurors were kept waiting in the courtroom or its environs.
 
 
 222
 Appellants urge that the rule ought not to be invoked here because the Court did not make the list of prospective petit jurors available to them until the morning of the trial, and they had no opportunity to investigate the jurors.
 
 
 223
 The Court found, however, that Appellants knew from and after December 28, 1963 that the case was assigned for trial on January 20, 1964; that a preliminary hearing was held on January 18, 1964, at which all counsel were present and no mention was made then of any intention to challenge the array; that the regular jury panel had been drawn prior to the commencement of the November 1963 term of court; that on December 28, 1963 the Court had ordered the drawing of two hundred additional names from the jury box for prospective jury service; and that the names of the additional jurors were drawn at a public drawing on January 9, 1964, at which at least one of counsel for Appellants was present.
 
 
 224
 At the drawing, however, on orders from the Court as a precautionary measure, only the last name and first initial of each prospective juror were announced. The full names, addresses and occupations of the jurors were not made available to counsel for the Government or for the defense until the morning of the trial.
 
 
 225
 Two defense counsel had previously inquired of the Clerk or Jury Commissioner as to the method used in procuring the names of the jurors. One of the counsel reported to the Court the Clerk's statement that he had done the best he could to try to get a cross-section of the community.
 
 
 226
 Information was available to counsel by inquiry of the Clerk or Jury Commissioner as to the manner in which the November 1963 Term panel and previous panels were drawn, and the names, residences and occupations of the jurors.
 
 
 227
 In view of the prior availability of all this information as to the system used, it was not necessary for Appellants to wait until the opening day of the trial to file their motions to strike the array. Appellants did not need the names, addresses and occupations of the January 9th panel in order to prepare and file their motions to strike the array.
 
 
 228
 In their arguments to the Court Appellants made no proffer to show by specific evidence that cognizable groups in the community had been systematically excluded or that the jury box did not in fact contain names of jurors representing a fair cross-section of the community.
 
 
 229
 As we pointed out in connection with the issue concerning the selection of the grand jury, the burden was upon Appellants to offer distinct evidence in support of their motions. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Appellants did not offer such evidence.
 
 
 230
 The nub of Appellants' argument to the Court was that the number of Negroes and blue collar workers in the jury box was disproportionate to their total representation in the community. But it is settled that Appellants were not constitutionally entitled to a proportionate number of any particular group on the jury roll or panel. Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.
 
 
 231
 The District Court was correct in denying the motions.
 
 6 Misconduct of Jury and U. S. Marshals
 
 232
 Misconduct of jury and U. S. Marshals was asserted in motions for a new trial which were accompanied by affidavits. The alleged misconduct of the jurors was that considerable whiskey and drinking-equipment was sent to the hotel floor on which the jurors stayed; that on one occasion jurors were seen with drinks in their hand; that one unidentified person who was thought to be a juror, came into the hotel in an intoxicated condition; and that in the hotel jurors had mentioned the name of Hoffa. Counter affidavits were filed by the foreman and other jurors and by the United States Marshals denying any misconduct.
 
 
 233
 The affidavits submitted by Appellants were insufficient to warrant a hearing. The Court in his memorandum opinion commented:
 
 
 234
 "Not a single affiant purports to have any personal knowledge of the activities or behavior of a single juror in respect to the use of beverages at any time, nor does any affidavit identify a single juror or a single officer as having done anything wrong in this respect."
 
 
 235
 The Court had the opportunity of observing the jury during the course of the long trial. He stated that —
 
 
 236
 "Each juror was both most alert and most patient throughout the trial";
 
 
 237
 that
 
 
 238
 "each juror conducted himself or herself with the utmost decorum and utmost impartiality throughout the trial";
 
 
 239
 that
 
 
 240
 "each juror conducted himself or herself with obvious awareness of his or her responsibility to give careful attention to each and every item of the evidence and instruction of the Court";
 
 
 241
 that
 
 
 242
 "Not once did the Court observe a lack of attention on the part of a single juror".
 
 
 243
 The Court frequently observed the jurors leaning forward in their seats listening to the proceedings.
 
 
 244
 Misconduct alleged of the Marshals which did not take place in the presence of the jury need not be considered.
 
 
 245
 With respect to remarks alleged to have been made by alternate juror Curbow, we think the Court properly handled the matter by repeating his instruction to the jury that they should not discuss the case among themselves. This alternate juror was excused when the regular panel was sent to deliberate.
 
 
 246
 7 The Prosecutor's Closing Argument to the Jury
 
 
 247
 Appellants contend that the Prosecutor's closing argument to the jury constituted prejudicial error so as to require a mistrial. We do not agree.
 
 
 248
 The case had been bitterly fought. The closing argument of the Prosecutor must be considered in the light of the previous arguments of defense counsel in order to determine whether there was provocation for what the Prosecutor said.
 
 
 249
 The Government's case was termed by one of the defense counsel in his argument as "a foul, filthy frame", a "diabolical plot" and "the Department of Justice [was] its mother". Another defense counsel said:
 
 
 250
 "At times you wonder in the course of this trial with these Washington prosecutors was Naziism really licked?"
 
 He continued:
 
 251
 "The outlaws in this whole case are the Washington prosecutors, engineered by Robert Kennedy and Mr. Sheridan."
 
 
 252
 These and other arguments made by defense counsel attacked the integrity of Government counsel. The Prosecutor had the right to make a vigorous response.
 
 
 253
 It was not improper for the Prosecutor to state his belief in the guilt of the Appellants where, as here, it was based upon the evidence in the case, Henderson v. United States, 218 F.2d 14, 50 A.L.R.2d 754 (C.A. 6, 1955) cert. denied 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253, and his integrity had been questioned. Nor was it wrong to argue that a person who had been proven guilty ought not to be acquitted.
 
 
 254
 We find no prejudice in the Prosecutor's reference to Appellant King having taken the Fifth Amendment at the Test-Fleet trial. King, in his direct testimony, indicated that he did resort to his privilege not to testify. He thus injected the subject into the case. In any event, the Court instructed the jury to disregard it.
 
 8 The Trial Court's Instructions
 
 255
 (a) Contentions and Theories
 
 
 256
 At the request of the Court the Government and each Appellant except Campbell submitted written requests for instructions to the jury which embodied their respective contentions and theories.
 
 
 257
 The Court instructed the jury as to Appellants' theories and contentions in the exact language contained in their requests to charge. With respect to Campbell, who submitted no request to charge, the Court instructed the jury that his position was that he was not guilty of the offense of which he had been charged.
 
 
 258
 The Court eliminated a substantial portion of the Government's requests and gave the balance in the language requested. The Court's instructions with respect to the Government's contentions and theories are contained in seven pages of the printed appendix, and as to the Appellants' on six pages.
 
 
 259
 All counsel had been advised on the previous day as to the requests to charge which the Court would give to the jury.
 
 
 260
 Appellants admit the propriety of the Court's instructions to the jury as to their own contentions and theories, but they think it was improper for the Court to instruct as to the Government's. They state:
 
 
 261
 "But we know of no authority for the court to present the theory of the Government as its theory is embodied in the indictment to which the Government must be held."
 
 
 262
 It is also true that the defendants' theories are embodied in their pleas of not guilty, but that does not mean that they are not entitled to have their theories fully presented to the jury where there is foundation therefor in the evidence.
 
 
 263
 In our opinion it was the function of the Court to instruct the jury as to the theories of both prosecution and defense. See Perez v. United States, 297 F.2d 12 (C.A. 5, 1961); Bernstein v. United States, 234 F.2d 475 (C.A. 5, 1956) cert. denied 352 U.S. 915, 77 S.Ct. 213, 1 L.Ed.2d 122; Marson v. United States, 203 F.2d 904 (C.A. 6, 1953).
 
 Appellants state:
 
 264
 "Not being apprized that the Court would go into such an elaborate summary of the evidence, the defendants were deprived of a fair charge by the Court on that issue only."
 
 
 265
 As we have previously stated, the record shows that Appellants were apprised on the day before that the Government's requested charges with respect to its theories would be given by the Court. Six pages of the appendix contain Appellants' requests verbatim. Appellants were represented by able and experienced counsel. If they thought at the time that their theories and contentions should be treated more extensively by the Court, the way was wide open for them to enlarge their requests, either on the day previous or at the time the requests were actually given. They had full opportunity to make the most of presenting their theories. If their requests were inadequate to present their theories, the fault certainly can not be charged to the Court.
 
 
 266
 (b) Reasonable Doubt
 
 
 267
 The Court properly instructed the jury on reasonable doubt. It was not necessary for him to give a charge (Request U) which related the doubt to a particular witness. The Court gave proper instructions on the credibility of witnesses.
 
 
 268
 (c) Ratification
 
 
 269
 Nor was the District Court required to give the requested instructions on ratification by Hoffa of the endeavors to influence the jury, as there was no evidence which would justify giving them. Hoffa did not admit that he knew of the endeavors nor that they were agreeable with him. He denied all of the statements attributed to him by Partin. If the Government's evidence was to be believed, he was an active participant, and not a mere ratifier.
 
 
 270
 (d) Informer Cautionary Instruction
 
 
 271
 Appellants contend that it was prejudicial error for the Court to refuse to give a specific cautionary instruction with respect to informers. They claim that Partin was a paid informer and that the Court should have instructed the jury that his testimony was to be received with caution.
 
 
 272
 There was no evidence that Partin received money from the Government except for expenses which he incurred some time after the trial. Whether a special cautionary instruction should have been given on informers was within the discretion of the Court, to be exercised in accordance with the particular facts and circumstances of each case. Siglar v. United States, 208 F.2d 865 (C.A. 5, 1954) cert. denied 347 U.S. 991, 74 S.Ct. 854, 98 L.Ed. 1125.
 
 
 273
 The Court did give a cautionary instruction although not in the language requested, and it did not mention informers specifically. It was a comprehensive charge on credibility, which covered all of the elements to be considered in weighing the testimony of the witnesses and parties in this case. He told the jury to —
 
 
 274
 "* * * scrutinize carefully the testimony given and the circumstances under which each witness has testified and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness' intelligence, his motives, state of mind, his demeanor and manner while on the witness stand. Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence."
 
 
 275
 He also instructed the jury on impeachment, false testimony, character evidence, conflicting testimony, perjurors, felons and self interest.
 
 
 276
 The Court was not required to give the instruction in the exact language requested by the defense. While it would have been better practice for the Court to have given a separate instruction with particular reference to the testimony of an informer, the failure to do so was not reversible error. United States v. Ball, 344 F.2d 925 (C.A. 6, 1965).
 
 
 277
 We do not consider this as a case where the testimony of the informer lacked corroboration.
 
 
 278
 (e) Presumption as to Witnesses Telling the Truth
 
 
 279
 The Court instructed the jury that there was a presumption that each witness, including the parties, has sworn to the truth and it was the duty of the jury to reconcile conflicting statements if they could, but if they could not, they were the exclusive judges of the credibility of witnesses and the weight to be given to their testimony. The Court instructed the jury that the presumption was rebuttable and may be outweighed by the manner in which the witness testified, by the character of the testimony given or by contradictory evidence. Taking the instruction as to presumption in its context with the entire instruction on credibility, we do not see how it could prejudice the Appellants.
 
 
 280
 (f) The Cautionary Instruction on Accomplice Testimony
 
 The instruction given was as follows:
 
 281
 "Should you find from the evidence in this case that any witness was an accomplice, you should keep in mind that such testimony is to be received with caution and weighed with care. An accomplice is one who unites with another person in the commission of a crime, voluntarily and with a common intent."
 
 
 282
 An instruction on accomplices had been requested by counsel for Appellant Parks. The Court did not give it in the form requested because it related to the witnesses, Walker and Fields. There was no evidence that Fields was an accomplice. There was also a question whether the witness, Oscar Pitts, was an accomplice. It was better for the Court under the circumstances of this case to give the instruction on accomplices in general terms rather than to relate it to the testimony of any particular witness. There was nothing in this instruction which related to the defendants as accomplices. In our opinion the instruction was not erroneous.
 
 
 283
 (g) Presumption of Innocence
 
 
 284
 We see nothing objectionable in the Court's instruction on the presumption of innocence. Appellants claim it should have gone further than it did, but they made no objection at the time and therefore cannot complain. Rule 30, Fed.R.Crim.P.
 
 
 285
 We do not think the charge of the Court was misleading or confusing as Appellants claim. The fact that the jury acquitted Hoffa and the defendants Dorfman and Tweel on Count IV of the indictment would seem to indicate a careful consideration of the evidence and an intelligent application of the Court's charge.
 
 
 286
 Upon consideration of the record as a whole, we find no error which affected the substantial rights of the Appellants. Rule 52, Fed.R.Crim.P.
 
 
 287
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Hoffa was convicted on Counts III and V of a five count indictment; Parks and Campbell were convicted on Count III; and King was convicted on Count V. Hoffa's motion for judgment of acquittal on Count II was granted; Hoffa and co-defendants, Dorfman and Tweel, were acquitted on Count IV
 Count I, which charged a conspiracy against Hoffa alone, was severed before trial. The Court had transferred the case for trial to Chattanooga in the Eastern Division. Defendant, Lawrence Medlin, who was indicted on Count II with Hoffa, obtained a writ of mandamus from this Court ordering the retransfer of his case to Nashville. This had the effect of granting him a separate trial. Hoffa was sentenced to a term of four years' imprisonment and to pay a fine of $5,000, on each count, the sentences to run consecutively. Parks, Campbell and King were sentenced to three years' imprisonment.
 
 
 [2]
 
 "United States District Court Office of the Clerk Middle District of Tennessee Nashville 3
 "We plan to draw a jury in the near future and would appreciate it if you would send us the names of some persons in your community who are qualified for federal jury service.
 For your guidance and information we quote the pertinent provisions of the statute defining `Qualifications of Federal jurors.'
 `Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless —
 (1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.
 (2) He is unable to read, write, speak, and understand the English language.
 (3) He is incapable, by reason of mental or physical infirmities to render efficient jury service.'
 What we ask from you is a list of persons for this important public service which will be a fair cross-section of the entire population of your community, representing both men and women of all races in all walks of life and having a variety of backgrounds, occupations, callings, economic classifications, religious and political affiliations, and other recognized groupings or classifications.
 For your convenience, we are enclosing a blank form on which you may list the names, together with a self-addressed franked envelope.
 We would appreciate it if you would send us your list of names as soon as possible.
 Very truly yours,
 Andrew H. Mizell,
 Clerk"
 
 
 [3]
 Affidavit of Andrew H. Mizell:
 "* * *
 "The suggesters are chosen because they are the persons who would be most widely acquainted with persons of every background and more likely to return a fair cross-section of their communities. Thus, while bankers and postmasters are used considerably, it is because they are the very people most likely to know persons with varied backgrounds and thus most likely to return a fair cross-section of their particular community.
 "Among the persons I selected as suggesters for the Grand Jury in question, were Negroes as well as White, females as well as male, and working people as well as businessmen and bankers. I have reviewed the list of suggesters submitted by defendants and agree that this list includes the suggesters actually returning names to me. The list does not include a number of other suggesters to whom I wrote, however, because these suggesters returned no names.
 "When these suggesters returned names of qualified persons, I went over the list and prepared the names for insertion in the jury box. I did not personally check the qualifications of every person whose name was submitted, for it has been my experience that the suggesters I and Mr. Climer pick do return only the names of qualified persons and can be relied upon to do so. Thus I have observed the empaneling and swearing of many grand and petit juries selected in this District in this manner and have noted that practically every name drawn from the box has been that of a qualified person.
 "In addition to the names I secured from suggesters, I selected, on my own without advice from any judge or other Government official, 15 to 20 names of persons I know to be qualified.
 "When I had secured sufficient names, Mr. Climer and I met, emptied the jury box, and, in the presence of witnesses, each put in 200 names, alternating in putting in one name at the time. Immediately thereafter, we drew 100 names from the box and these persons became the panel from which were selected the 23 persons who made up the instant Grand Jury.
 "I made no effort to exclude any group from the jury box. On the contrary, my every effort throughout was to secure a fair cross-section of the community — the Middle District of Tennessee.
 ANDREW H. MIZELL"
 
 
 [4]
 In a memorandum opinion denying the motion to dismiss the indictment, the Court said:
 "In the face of the specific caveat in the court's order of July 18, 1963, defense counsel sought at the very outset of the hearing to begin calling witnesses without offering any argument in support of their right to do so. Furthermore, the first witness offered was the court clerk, one of the persons the defendants were accusing at least of abuse of discretion and at most of malfeasance in office. Upon the court's inquiry, defense counsel disclosed the proposal to prove their entire case out of the mouths of the clerk, the jury commissioner, and seventy-seven of the ninety-two suggesters listed in the exhibit to their motion. No other witness was then or thereafter offered; no other proof was offered by affidavit or otherwise. On the naked, unsworn and tardy assertions by counsel of the improbable proposition that all these people could be relied upon to plead guilty to the charges against them, the court was asked to permit them to be called.
 "As indicated at the outset of this memorandum, this would have been at best a wholesale open court discovery proceeding, at worst an inquisition. The court could not have and did not permit it."
 
 
 [5]
 Appellants claim in their brief that 13.2% of the population over 21 years of age, in the Middle District of Tennessee, was non-White, 12% Catholic, and 2% Jewish. There were many manual or blue collar workers. There were labor unions
 
 
 [6]
 The statement was in part as follows:
 "It is perfectly right and proper that grand juries should include those who keep up with events of current interest, read newspapers, listen to radio broadcasts, and watch television. It is not even improper for a grand juror to let his prior information, however gained, help to guide him in taking part in an investigation.
 "But it would not be proper — and I emphasize this — for a grand juror to rely on information gained outside the grand jury room in arriving at his decision whether or not to vote for a true bill against any person, or to approach an investigation with his mind made up about what result should be reached.
 "Therefore, if any of you have read or heard of any alleged violation of federal law that conceivably could come before you as grand jurors, it would not be proper for you to serve unless you can honestly and conscientiously say that you will approach any investigation with an open mind and will act in your official capacity only on the evidence heard by you in the grand jury room.
 "Now, a grand juror does not have to decide finally whether a man is in fact guilty or innocent — the petit jury does that after the indictment is returned. A grand juror must decide only whether or not he has seen and heard in his official investigation sufficient evidence to justify a reasonable man in believing an accused person is guilty of a crime. This is something more than the reasonable suspicion that will justify an investigation and something less than the moral certainty on which a petit jury acts."
 
 
 [7]
 "Now, let me ask you a question. Does any one among you believe that anything you have seen or heard about any alleged federal crime, or crimes, has so impressed your mind that you would have any difficulty in taking that oath without any mental reservations whatsoever? If so, please raise your hand. (Indication in the negative.)
 "The Court: No hands have been raised, which means to me that all of you have indicated that you feel that you can take the oath that I have read to you without any mental reservations, that you can approach any investigation with an open mind, and that you can disregard any reports or rumors that you may have heard and act only on the evidence that is presented to you in the grand jury room. Is that correct? If not, please hold up your hands. (Indication in the negative.)
 "Now, let me ask you one final question. Does any one of you know of anything that would cause any reasonable person to believe honestly that you would be prejudiced in any matter that may come before a federal grand jury? If so, please raise your hands. (Indication in the negative.)
 "Do you know of anything that could cause anybody else, a reasonable person to believe honestly that you would be prejudiced on any matter coming before a federal grand jury? (Indication in the negative.)
 "I think that you are qualified and the clerk will now administer the oath to the grand jury."
 
 
 [8]
 The selection of the jury started in the Test-Fleet case that morning. When the Court adjourned for the day prospective juror Tippens returned a telephone call made to him by his neighbor Medlin. He met with Medlin who offered him $10,000. in $100 bills, to influence his vote as a juror. Tippens reported this to the Presiding Judge, and was excused as a juror
 
 
 [9]
 Appellant Campbell is a Negro and is the nephew of Appellant Parks. Parks' efforts were directed at bribery of the son and contact with the daughter of the juror, Gratin Fields, who was the only male Negro on the jury
 
 
 [10]
 King and one Pitts did meet with Patrolman Paschal at midnight at a river spring. King offered Paschal a promotion if he would speak to his wife who was on the jury. Paschal told King he would speak to his wife. The Court on motion of the Government, excused Mrs. Paschal from the jury on December 6, 1962, after a closed hearing. On December 20, 1962, Fields was excused from the jury on motion of the Government. An affidavit by Partin as to the remarks made to him by Hoffa on November 7 was submitted to the Court in sealed form
 
 
 [11]
 "Gentlemen, the Court has overnight read all the cases that were cited last evening including I find all but two of the cases that are cited this morning in any of the memoranda and I have looked at those this morning. And have read other cases which I do not find cited in the memoranda. The Court is of the opinion that the motion to suppress the testimony of the witness Mr. Partin should be overruled, having observed the manner and demeanor of the witness on the witness stand, and the testimony of the witnesses, I would find that there has been no interference by the government with any attorney-client relationship of any defendant in this case
 "`I would further find that the government did not place this witness Mr. Partin in the defendants' midst or have anything to do with placing him in their midst, rather that he was knowingly and voluntarily placed in their midst by one of the defendants.'
 "As the Court understands and interprets the law, there is no basis for denying the government the use of this witness' testimony in this case."
 
 
 [12]
 "The action of the Court in denying the motions of the defendants to suppress the testimony of the witness Partin is complained of in Grounds 41 and 42 of the motions for new trial. It is contended that one of the findings of fact of the Court with respect to the motion to suppress was rendered incorrect by subsequent evidence in the case. It is contended that the telephone transcriptions of the telephone calls between Partin and Hoffa on October 8 and 18, 1962, established that the defendant Hoffa did not invite Partin to Nashville. The telephone transcriptions reflect that the defendant Hoffa agreed to an appointment to see Partin in Nashville. Even if the defendant Hoffa did not initiate the invitation of Partin to come to Nashville, but rather Partin solicited the invitation, this does not in any way alter the Court's finding that the Government did not place or keep Partin with the defendant Hoffa. Neither does it in any way relate to or in any way alter the Court's finding that there was no illegal interference with the right of the defendant Hoffa to representation by counsel. The Government requested of Partin only that he report information of jury tampering or other illegal activity of which he became aware. Partin voluntarily furnished such information. He remained in Nashville or returned to Nashville either at the request or with the consent of the defendant Hoffa and not at the instruction of the Government. Finally, the presence of Partin during the course of the Nashville trial and the reporting of information by him does not in any way relate to the rights of the defendants in the preparation and trial of this lawsuit. As a matter of law, the motions to suppress were properly overruled."